Carolyn MULLEN, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 14663.

United States Court of Appeals
District of Columbia Circuit.

Argued Nov. 21, 1958.

Decided Dec. 4, 1958.

Additional Statements Jan. 29, 1959.

Mr. Lawrence J. Latto, Washington, D. C. (appointed by this court) for appellant.

Mr. Walter J. Bonner, Asst. U. S. Atty., with whom Messrs. Oliver Gasch, U. S. Atty., and Carl W. Belcher, Asst. U. S. Atty., were on the brief, for appellee.

Before Mr. Justice REED, retired,* and EDGERTON and FAHY, Circuit Judges.

EDGERTON, Circuit Judge.

This appeal is from a conviction under D.C.Code (1951) § 22–901, which makes it a crime to "torture, cruelly beat, abuse, or otherwise wilfully maltreat" a child. Appellant's young children were found chained in her house while she was absent. There was evidence that she had chained them, and also that she had done so for their "protection". The District Court rightly charged the jury as a matter of law that appellant did not "torture" the children. But with regard to the statutory words "abuse" and "wilfully maltreat", the court charged the jury to decide whether appellant "was acting reasonably under the circumstances or whether it was unreasonable and dangerous."

It was certainly unreasonable, and probably dangerous, to chain the children. But if appellant chained them for their own protection, she did not "abuse" or "wilfully maltreat" them within the meaning of the Code. That language calls for something worse than good intentions coupled with bad judgment. As we recently held in construing less explicit statutory language, "the common law concept of crime as a combination of an evil state of mind with the doing of an evil act applies to this felony." Levine v. United States, 104 U.S.App.D.C. ——, 261 F.2d 747; Morisette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288. The court's charge omitted the requirement of an evil state of mind and was therefore erroneous.

The jury might well have acquitted appellant but for the erroneous charge. We therefore reverse under F.R. Crim.P. Rule 52(b), 18 U.S.C. Cf. Screws v. United States, 325 U.S. 91, 107, 65 S. Ct. 1031, 89 L.Ed. 1495. We do not consider other alleged errors.

Appellant is a woman of limited understanding. She was indicted more than two years ago and imprisoned more than one year. We commend these facts to the consideration of the United States Attorney.

Reversed.

FAHY, Circuit Judge (concurring).

In concurring I add that another ground for reversal is urged by appellant, namely, the admission in evidence of the testimony of a minister of statements made to the minister by the appellant as a penitent in preparation for receiving communion as a Lutheran communicant. Not desiring to delay the decision, I will file at a later date a statement of my views on the question of the admissibility of this testimony.

Statement by Circuit Judge FAHY, with Whom Circuit Judge EDGERTON Concurs, and Separate Statement by Circuit Judge EDGERTON, on the Question of the Admissibility of Certain Testimony.

### January 29, 1959

FAHY, Circuit Judge, with whom Circuit Judge EDGERTON concurs: When the case was decided December 4, 1958, I concurred and stated that I would later give my views on the question of admissibility of the testimony of a minister as to statements made to him by appellant as a penitent in preparation for receiving communion as a Lutheran communicant. The question is whether these statements were privileged communications, such as those between husband and wife and client and attorney, and, therefore, not admissible in evidence.

The minister had testified briefly as a character witness for appellant. He then appears to have become troubled because of what occurred subsequent to his testimony. Appellant had taken the stand and had denied chaining the children. The minister then asked to see the trial judge and visited him in chambers, where he stated that he felt he had been unable to say all that his conscience impelled him to say. As a result the judge himself recalled the minister as the court's witness to give further evidence.

* Sitting by designation pursuant to Sec. 294(a), Title 28 U.S.Code.

After stating his impressions of the family and the relations between the children and appellant, their mother, the minister testified as follows:

> "[A]fter I had seen the defendant in the District Jail, she came to my office. She wanted to know whether she could come to communion. I advised her that as long as there was any suspicion as to her mistreating the children by chaining them I could not admit her to communion; that the Good Book says that if we confess our sins God is faithful and just to forgive us our sins and to cleanse us from all unrighteousness.
>
> "She admitted that she had chained the children with the explanation that she did it for their protection * * * .
>
> "I advised her and counselled with her that that was wrong and sinful."

■ The lack of objection to this testimony does not preclude our ruling upon its admissibility. There was no affirmative consent to its use, and the fact that the judge called the witness tended to restrain objection. In addition, uncertainty as to the applicable rule of evidence goes far to excuse failure to object. But more important, the testimony was so critical that we should exercise our discretion to consider its admissibility even if not required to do so. " 'Plain errors * * * affecting substantial rights may be noticed although they were not brought to the attention of the court.' Rule 52(b), Fed.Rules Crim.

Proc. 18 U.S.C.A." Pinkard v. United States, 99 U.S.App.D.C. 394, 395, 240 F. 2d 632, 633. Appellant had denied chaining the children and there was no direct evidence that she had done so except a reluctant assent drawn from her loyal, six-year old son after he had been subjected to a lengthy and persistent examination, despite his age, during which he had repeatedly exonerated his mother.

■ A further preliminary matter. Was the disclosure of appellant to the minister a confidential confession to a spiritual adviser? The answer would be clearer were the relationship of priest and penitent involved, where the priest is known to be bound to silence by the discipline and laws of his church. The present witness appears not to have felt bound in this manner. But I think the privilege if it exists includes a confession by a penitent to a minister in his capacity as such to obtain such spiritual aid as was sought and held out in this instance.[1] The minister definitely indicated that by confessing her sins to him appellant would receive the spiritual benefits she desired. In any event, enough was indicated to cause further inquiry by the court as to the character of the disclosure if doubt remained. In these circumstances I deem it appropriate to reach the question of admissibility, especially as the question might arise again should the case be retried. My view is that such a confession is a privileged communication which is not competent evidence on a trial, at least in the absence of the penitent's consent to its use.[2]

1. See In re Swenson, 1931, 183 Minn. 602, 237 N.W. 589, 590, where, though the statute applied to such a confession "in the course of discipline enjoined by the rules or practice of the religious body to which he [the minister] belongs"— in that case also the Lutheran Church— the privilege was recognized.

2. The fact that the minister testified on behalf of appellant as a character witness did not waive the privilege. As Wigmore, infra, has stated at p. 831, "a waiver is to be predicated * * * only when the conduct indicates a plain intention to abandon the privilege." The

minister's original testimony was limited to his knowledge of what other people in the community thought of appellant with respect to whether she was a good mother. Only after the minister left the stand and sought out the judge did the judge recall the minister as the court's witness. "Testimony of the attorney which does not relate to privileged communications between him and his client, does not constitute a waiver of the privileged communications." Drayton v. Industrial Life & Health Ins. Co., 205 S.C. 98, 31 S.E.2d 148, 154. And see Montgomery v. Pickering, 1874, 116 Mass. 227:

In Totten v. United States, 92 U.S. 105, 107, 23 L.Ed. 605, the Supreme Court said:

"[S]uits cannot be maintained which would require a disclosure of the confidence of the confessional, or those between husband and wife, or of communications by a client to his counsel for professional advice, or of a patient to his physician for a similar purpose."

This was dictum, since the confessional privilege was not involved. So, too, is Judge Learned Hand's statement in McMann v. Securities and Exchange Commission, 2 Cir., 1937, 87 F.2d 377, 378, 109 A.L.R. 1445, certiorari denied McMann v. Engle, 301 U.S. 684, 57 S.Ct. 785, 81 L.Ed. 1342, where he included among the traditional privileges that of a penitent. And Judge Holtzoff of our District Court has also said in passing that under the law of the United States privileged communications include that of "clergyman and penitent" as well as those of attorney and client and physician and patient.[3] These statements, though not decisions on the question, indicate the correct position. They assume the existence of the privilege.

It is highly probable that the priest-penitent privilege was part of the common law of England in the centuries preceding the Reformation. See the lengthy study by Nolan, The Law of the Seal of Confession, 13 Catholic Encyc. 649–65. This same study demonstrates, however, that after the Reformation the privilege was by no means generally recognized, and in fact appears to have been abrogated or abandoned. Because of this it

is said the claimed privilege was not one at common law and, therefore, if now to be recognized must be enacted into statute, which Congress has not done.[4] However, as we shall see, recognition of the privilege in federal courts does not depend upon finding that it has either existed uniformly at common law or has been approved in terms by act of Congress. Before enlarging upon this it is worth noting that even during the post-Reformation period, when religious and political tensions largely set the pattern in such matters, judicial decisions and legal writings were not uniformly hostile to the privilege.[5]

The resolution of the problem today for federal courts is to be found in a proper application of Rule 26, Fed.R. Crim.P., adopted in 1948 under the authority of Congress. This Rule provides:

" *  *  * The admissibility of evidence and the competency and privileges of witnesses shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience."

This was decisional law even before thus formalized in a Rule. See Notes of the Advisory Committee on the Rules, where it is stated that Rule 26 reflects the decisions of the Supreme Court in Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369, and in Wolfle v. United States, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617. And see Hawkins v. United States, 358 U.S. 74, 79 S.Ct. 136, 3 L.Ed.2d 125,

Blount v. Kimpton, 1892, 155 Mass. 378, 29 N.E. 590.

3. United States v. Keeney, D.D.C.1953, 111 F.Supp. 233, 234, reversed on other grounds, 94 U.S.App.D.C. 366, 218 F.2d 843. As possibly to the contrary see reference in H.R.Rep. No. 2520, 85th Cong., 2d Sess. (1958), to a case of MacArthur v. MacArthur in the Municipal Court of the District of Columbia.

4. Many states have placed the privilege on a statutory basis.

5. Coke, sometimes cited as standing against the privilege, seems to have recognized it except in treason trials. 2 Institutes 629. And see 8 Wigmore, Evidence (3d ed.) where at pp. 844–845 the author sets forth a letter from Coleridge to Gladstone discussing the privilege and, at pp. 848–849, a statement of Bentham, reputed to be the greatest opponent of privileges in general, in which he justifies recognition of this particular privilege.

decided as recently as November 24, 1958, where, though adhering to the rule disqualifying a wife from testifying in a criminal case against her husband, the Court restated the authority conferred upon the federal courts by Rule 26 "to determine admissibility of evidence under the 'principles of the common law as they may be interpreted * * * in the light of reason and experience.'"

The developments and governing principles are explained in Lutwak v. United States, 344 U.S. 604, 613–615, 73 S.Ct. 481, 487, 97 L.Ed. 593, as follows:

"The Funk case left the rules of evidence as to the competency of witnesses to be formulated by the federal courts or Congress in accordance with reason and experience. Wolfle v. United States, 291 U.S. 7, 12 [54 S.Ct. 279]. There followed the promulgation by this Court of Rule 26 of the Federal Rules of Criminal Procedure. * * * This rule was a paraphrase of Mr. Justice Stone's statement in Wolfle, 291 U.S. at [page] 12 [54 S.Ct. at page 279].

"Under this rule, the competency of witnesses is to be governed by the principles of the common law as they *may be* interpreted by the courts in the light of reason and experience. The governing principles are not necessarily as they had existed at common law. Congress has not acted, and has specifically authorized this Court to prescribe rules of criminal procedure, but the rules do not specifically answer the problem here. Therefore, it is open to us to say whether we shall go further and abrogate this common-law rule disqualifying one spouse from testifying in criminal cases *against* the other spouse.

\* \* \* \* \* \*

" 'It has been said so often as to have become axiomatic that the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions.' Funk v. United States, supra, 290 U.S. at page 383, 54 S.Ct. at page 216." [6]

Funk v. United States, supra, involved the competency of a wife to testify on behalf of her husband on trial for crime in a federal court. In departing from the common law rule which would have rendered her incompetent the Court quoted approvingly from the opinion in Rosen v. United States, 245 U.S. 467, 471, 38 S.Ct. 148, 150, 62 L.Ed. 406, where in a case involving the old rule disqualifying a witness convicted of crime, the Court had concluded "that the dead hand of the common-law rule of 1789 should no longer be applied to such cases * * *."

The decisions to which we have referred, as well as Rule 26, leave the federal courts, with ultimate authority in the Supreme Court, free to resolve our present question without additional legislation. It is true that the trend of decisions has been chiefly in the direction of enlarging rather than restricting the area of admissibility of evidence,[7] but the governing principle is the same. When reason and experience call for recognition of a privilege which has the effect of restricting evidence the dead hand of the common law will not restrain such recognition.

We come then to the final question whether reason and experience do call for present recognition of the confessor-confessant privilege. For the answer we rely heavily upon the lengthy discussion of privileged communications contained in 8 Wigmore, Evidence §§ 2285–2296 (3d ed.). It is there shown that all the conditions of the basic common law applicable to privileged communications

---

6. The Lutwak case had to do with the competency of women who had gone through marriage ceremonies as part of a plan to evade the immigration laws to testify against their "ostensible" spouses. Their testimony was permitted.

7. See concurring opinion of Mr. Justice Stewart in Hawkins v. United States, supra.

apply to the relationship of priest-penitent. The author says "this privilege has adequate grounds for recognition" when tested by the four canons governing privileged communications, namely,

"(1) The communications must originate in a *confidence* that they will not be disclosed;

"(2) This element of *confidentiality must be essential* to the full and satisfactory maintenance of the relation between the parties;

"(3) The *relation* must be one which in the opinion of the community ought to be sedulously *fostered;* and

"(4) The *injury* that would inure to the relation by the disclosure of the communications must be *greater than the benefit* thereby gained for the correct disposal of litigation." [Italics in the original.]

It thus appears that non-recognition of the privilege at certain periods in the development of the common law was inconsistent with the basic principles of the common law itself. It would be no service to the common law to perpetuate in its name a rule of evidence which is inconsistent with the foregoing fundamental guides furnished by that law. And, as we have seen, the denial was never uniform or resolute, so strong were the claims of reason in support of the privilege. See discussion in Wigmore, supra, at §§ 2394-96; People v. Daniel Phillips and Wife, 1 West.L.J. 109 (1813). In our own time, with its climate of religious freedom, there remains no barrier to adoption by the federal courts of a rule of evidence on this subject dictated by sound policy.[8]

Sound policy—reason and experience—concedes to religious liberty a rule of evidence that a clergyman shall not disclose on a trial the secrets of a penitent's confidential confession to him, at least absent the penitent's consent. Knowledge so acquired in the performance of a spiritual function as indicated in this case is not to be transformed into evidence to be given to the whole world. As Wigmore points out, such a confidential communication meets all the requirements that have rendered communications between husband and wife and attorney and client privileged and incompetent. The benefit of preserving these confidences inviolate overbalances the possible benefit of permitting litigation to prosper at the expense of the tranquility of the home, the integrity of the professional relationship, and the spiritual rehabilitation of a penitent. The rules of evidence have always been concerned not only with truth but with the manner of its ascertainment.[9]

8. In the course of a detailed discussion of the subject of evidentiary rules in this jurisdiction the opinion of Mr. Justice Frankfurter for the Court in Griffin v. United States, 336 U.S. 704, 714, 69 S. Ct. 814, 818, 93 L.Ed. 993, states:

"If Congress can enact substantive rules of criminal law exclusively for the District of Columbia,4 the Court of Appeals for the District of Columbia ought not to be denied opportunity to formulate rules of evidence appropriate for the District, so long as the rules chosen do not offend statutory or constitutional limitations."

It is clear that such rules of evidence need not find their precise counterparts in the common law. This opinion was handed down within twelve months after the adoption of Rule 26, Fed.R.Crim.P., supra, and has the effect of delegating as it were to this court at least initial authority to formulate rules of evidence, for this jurisdiction, within the limitations stated. See, also, Stein v. People of State of New York, 346 U.S. 156, 187, 73 S.Ct. 1077, 97 L.Ed. 1522, where the Supreme Court, as it had in McNabb v. United States, 318 U.S. 332, 341, 63 S.Ct. 608, 613, 87 L.Ed. 819, referred to its power to promulgate rules of evidence for the federal courts. And see our own decision in Gillars v. United States, 87 U.S.App.D.C. 16, 23, 182 F.2d 962, 969.

9. The view I take of the authority of the federal courts under Rule 26, without the need of further legislation by Congress, has made it unnecessary to review all authorities cited to us. However, for the convenience of the student I append a reference to those cited but which have not been used in the text of this statement.

EDGERTON, Circuit Judge.

I think a communication made in reasonable confidence that it will not be disclosed, and in such circumstances that disclosure is shocking to the moral sense of the community, should not be disclosed in a judicial proceeding, whether the trusted person is or is not a wife, husband, doctor, lawyer, or minister. As Mr. Justice Holmes said of wire-tapping, "We have to choose, and for my part I think it a less evil that some criminals should escape than that the Government should play an ignoble part." Olmstead v. United States, 277 U.S. 438, 470, 48 S.Ct. 564, 575, 72 L.Ed. 944 (dissenting opinion).

Cited or referred to by court-appointed counsel for appellant:

Commonwealth v. Drake, 1818, 15 Mass. 161; Bahrey v. Poniatishin, 1920, 95 N.J.L. 128, 112 A. 481; State v. Morehous, 1922, 97 N.J.L. 285, 117 A. 296; Christian Smith's Trial, 1 Amer.St. Trials 779 (1817); Cook v. Carroll, Ir. R. 515 [1945]; 97 C.J.S. Witnesses § 263 (1957); 50 Harv.L.Rev. 4 (1936) (reprint of "The Common Law in the United States" by C. J. Stone); Hogan, A Modern Problem on the Privilege of the Confessional, 6 Loyola L.Rev. 1 (1951).

Cited or referred to by the United States, omitting, however, those listed as cited by counsel for appellant:

Attorney General v. Briant, 15 Law J.Rep.(N.S.)Excheq. 265, 271 (1846); Reg. v. Griffin, 6 Cox's Criminal Law Cases 219 (1852-55); Reg. v. Castro (Tichborne Trial), 1 Charge of C.J. 648 (1874); 58 Am.Jur. Witnesses § 531 (1948); Annotation, 1952, 22 A.L.R.2d 1152; 8 Wigmore Evidence p. 843 (3d ed.); 1 Cath. Lawyer 199, 213 (1955); N.Y.Civil Practice Act, § 351.